# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER SIMMONS,<br><br>Plaintiff,<br><br>v.<br><br>J. AKANNO, et al.,<br><br>Defendants. | Case No. 1:10-cv-00553-AWI-SAB-PC<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANT AKANNO'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, AND THAT DEFENDANTS KELDGORD, CAMPAS, COVARRUBIAS, AND HEDGPETH'S MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>[ECF Nos. 80, 90]<br><br>**THIRTY-DAY DEADLINE** |

Plaintiff Christopher Simmons, who is appearing with retained counsel, proceeds in this action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12203(a). This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

Currently before the Court are (1) Defendants Keldgord, Campas, Covarrubias, and Hedgpeth's motion for summary judgment, filed March 25, 2016, and (2) Defendant Akanno's motion for summary judgment, filed May 25, 2016.

## I.

## RELEVANT HISTORY

This action proceeds on the third amended complaint against Defendants for claims of retaliation in violation of the Americans With Disabilities Act, 42 U.S.C. § 12203(a), for violations of the California Disabled Persons Act, Cal. Civ. Code §§ 54(c), 54.1(d), and for violations of the Unruh Civil Rights Act, Cal. Civ. Code § 51(f).

1    On February 27, 2015, Defendants Akanno, Campas and Hedgpeth filed an answer to the

2  third amended complaint. (ECF No. 60.) On March 27, 2015, Defendant Kelgord filed an

3  answer. (ECF No. 66.) On September 29, 2015, Defendant Covarrubias filed an answer. (ECF

4  No. 71.) On March 3, 2015, a discovery and scheduling order was issued, (ECF No. 61), which

5  was extended to Defendant Kelgord on March 31, 2015, (ECF No. 67), and to Defendant

6  Covarrubias on October 1, 2015, (ECF No. 73).

7    As noted above, on March 25, 2016, Defendants Keldgord, Campas, Covarrubias, and

8  Hedgpeth filed the first of the subject motions for summary judgment. (ECF No. 80.)  Plaintiff

9  filed an opposition on April 21, 2016, (ECF No. 85), and Defendant filed a reply on April 28,

10  2016, (ECF No. 88), along with a request for judicial notice, (ECF No. 89), and other evidence in

11  support.

12    On May 25, 2016, Defendant Akanno filed the second subject motion for summary

13  judgment, (ECF No. 90), along with a request for judicial notice, (ECF No. 90-2), and other

14  evidence in support. On July 12, 2016, Plaintiff filed a statement of non-opposition to that

15  motion. (ECF No. 93.)

16    These motions for summary judgment are deemed submitted for review without oral

17  argument. Local Rule 230(l).

**II.**

**LEGAL STANDARD**

20    Any party may move for summary judgment, and the Court shall grant summary

21  judgment if the movant shows that there is no genuine dispute as to any material fact and the

22  movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks

23  omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's

24  position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

25  particular parts of materials in the record, including but not limited to depositions, documents,

26  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

27  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

28  support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider

1  other materials in the record not cited to by the parties, but it is not required to do so. Fed. R.

2  Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir.

3  2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

4      In judging the evidence at the summary judgment stage, the Court does not make

5  credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509

6  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

7  inferences in the light most favorable to the nonmoving party and determine whether a genuine

8  issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v.

9  City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation

10  omitted).

11  **III.**

12  **DISCUSSION**

13  **A.   Allegations of Third Amended Complaint**

14      During the summer of 2007, Plaintiff filed an action titled Simmons v. Hedgpeth, 1:07-

15  cv-01058-LJO-SAB ("Hedgpeth"). In Hedgpeth, Plaintiff alleged (among other things) that Kern

16  Valley State Prison ("Kern Valley") provided inadequate air circulation during a particularly hot

17  summer, thereby discriminating against Plaintiff, a disabled inmate identified as a "heat risk" due

18  to his prescribed medications, in violation of Title II of the ADA. Later, Plaintiff sought to have

19  the Hedgpeth case certified as a class action. In furtherance of that goal, Plaintiff organized other

20  "heat risk" inmates. (Third Am. Cmpl., ECF No. 52, ¶¶ 14-15.)

21      By early August 2008, Defendants began to subject Plaintiff to materially adverse

22  conduct, including the following: denying and/or delaying his release from work assignments;

23  denying him access to the Inmate Advisory Council (IAC), an inmate organization of which

24  Plaintiff was an Executive Body Member and the elected ADA chairman; and denying or

25  delaying him access to timely medical treatment, specifically pain medications. (Id. at ¶¶ 18, 26-

26  29.)

27      Plaintiff filed several officer misconduct forms reporting the adverse conduct. Defendants

28  responded by subjecting Plaintiff to more adverse conduct, including: additional denial/delays of

Plaintiff's release for work assignments; delaying release for IAC meetings; denying Plaintiff access to the upper yard, an open area of Kern Valley; and denying Plaintiff access to medical showers. (Id. at ¶¶ 19-20.)

In October of 2008, Plaintiff filed a CDCR 1824, Request for Reasonable Accommodation ("CDCR Form 1824"). Prison officials met with Plaintiff. Plaintiff was asked to act as an informant and report conduct of the IAC members. Plaintiff refused to do so. Days later, Plaintiff was told that he could no longer be an IAC member, as the ADA chair position had been removed. (Id. at ¶¶ 20, 24.)

On October 21, 2008, Plaintiff filed a second CDCR Form 1824, which resulted in more retaliatory conduct. Plaintiff filed a third CDCR Form 1824 in January of 2009, alleging discrimination based on Plaintiff's disability. In February of 2009 Plaintiff filed a fourth CDCR 1824 alleging Due Process and First Amendment violations. (Id. at ¶¶ 25, 30, 32.) Plaintiff alleges that between August of 2008 and February of 2009, nine grievance forms and/or legal communications were either censored or destroyed as retaliation for his efforts to enforce his rights under the ADA. (Id. at ¶ 34.)

**B.      Defendants Keldgord, Campas, Covarrubias, and Hedgpeths' Motion for Summary Judgment**

Defendants Keldgord, Campas, Covarrubias, and Hedgpeth contend that are entitled to summary judgment on Plaintiff's retaliation claims under the Americans with Disabilities Act ("ADA") because the undisputed facts prove that they did not take any adverse action against Plaintiff based on him asserting his rights under the ADA, and because their conduct towards him furthered legitimate non-retaliatory purposes. These Defendants further contend that they are entitled to summary judgment on Plaintiff's claims under the California Disabled Persons Act ("CDPA") and Unruh Civil Rights Act ("UCRA"), because they did not violate those laws and because Plaintiff failed to comply with the California Government Claims Act, precluding him from bringing such claims.

///
///

1    Plaintiff opposes the dismissal of his ADA claims, but not the dismissal of his CDPA and

2    UCRA claims. He agrees that he is procedurally barred from bringing his CDPA and UCRA

3    claims. (ECF No. 85, p. 14.).

4        1.    Undisputed and Disputed Material Facts

5        a.    **2007 Events**

6        There is no dispute that Plaintiff is, and was at all relevant times in this action, disabled.

7    He has congenital failure segmentation at C2-3, retrolisthesis of C3-4; and Luschka's joint at C3-

8    4, 4-5, and 5-6. (First Am. Compl., ECF No. 13, ¶ 6.)[1]

9        Plaintiff's claims concern events that occurred when he was housed at Kern Valley.

10   Plaintiff was (and is) permanently confined to a wheelchair, and was prescribed daily showers

11   and medication for persistent and debilitating pain. (First Am. Compl. ¶ 7.) While at Kern

12   Valley, Plaintiff served as the ADA Chairman and as an Executive Body Member on the Inmate

13   Advisory Council ("IAC"). (Id. at ¶ 15.)

14       On July 23, 2007, Plaintiff filed the action entitled Simmons v. Hedgpeth, et al., Case No.

15   1:07-cv-01058-LJO-SAB. (Hedgpeth Compl., ECF No. 89-1, pp. 2-16.) The complaint in that

16   action was screened, and on July 9, 2013, the district judge ordered that the Hedgpeth action

17   would proceed for damages against certain defendants, and certain other defendants, including

18   specifically Defendant Hedgpeth, were dismissed for failure to state a claim. (July 9, 2013 Order,

19   ECF No. 89-1, pp. 24-25.) The Court then ordered for service to be initiated upon the remaining

20   defendants in that action. (July 10, 2013 Order, ECF No. 89-1, pp. 27-29.)[2]

21       Plaintiff alleged in Hedgpeth, among other things, that Kern Valley officials violated

22   Title II of the ADA by failing to provide adequate air circulation during a particularly hot

23

24   [1] Plaintiff relies on his first amended complaint to support some of his factual allegations. Since that
     complaint is a verified complaint signed under penalty of perjury, he may rely on it for the purposes of

25   opposing a motion for summary judgment, to the extent the facts asserted are based on his personal
     knowledge. See, e.g., Silvis v. Davis, 585 F. App'x 606, 609 (9th Cir. 2014).

26
     [2] Defendants request that the Court take judicial notice of these proceedings in Hedgpeth. (ECF No. 89.)

27   The undersigned recommends that this request be granted. See Fed. R. Evid. 201; see also United States
     v. Howard, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (finding that the court may take judicial notice of court

28   records in other cases).

summer, thereby discriminating against Plaintiff, a disabled inmate identified as a "heat risk" due to his prescribed medications. (Hedgpeth Compl.; see also Pl.'s Depo. 73:3-6.) Plaintiff intended to have the Hedgpeth action certified as a class action, and sometime in mid-2007, he began to organize other "heat risk" inmates as potential class members. (See Pl.'s Depo. 47:18-19, 64:10-24, 113:16-24, 189:14-16.)

On December 7, 2007, Plaintiff filed a CDCR 1824 Form, stating that the proximity of fixed lockers to the bunk in the two ADA-designated cells was dangerous, and presented the risk of injury. (11/7/07 CDCR 1824 Form, ECF No. 85-4, p. 47.)[3] Plaintiff contends that sometime later that month, Defendant Keldgord came to interview Plaintiff at his cell in Building 1, regarding the Hedgpeth action, and they also discussed Plaintiff's contentions that the cell conditions were dangerous for disabled inmates. (Pl.'s Depo. at 74:13-76:7.) Defendant Keldgord also saw that Plaintiff had a walker in his cell. (Id. at 74:17-18, 75:10-12.) At the time of the events at issue, Defendant R. Keldgord was employed by the California Department of Corrections and Rehabilitation ("CDCR") as an Associate Warden at Kern Valley, and also served as the ADA Coordinator. (Keldgord Decl., ECF No. 80-3, ¶¶ 2-3.)

Defendant Keldgord declares that at the time he learned that Plaintiff was provided with both a wheelchair and a walker, he understood that Plaintiff was designated as DPW, meaning that he was a full-time wheelchair user. (Keldgord Decl. ¶ 5.) According to Defendant Keldgord, he understood that a full-time wheelchair user who was unable to ambulate did not need a walker. (Id. at ¶ 5.)

Defendant Keldgord also declares that his duties as the ADA Coordinator included identifying inconsistencies in an inmate's mobility designation under the CDCR Disability Placement Program. (Keldgord Decl. ¶ 3.) Defendant Keldgord contends that typically, if he learned of an inconsistency in an inmate's mobility designation, he would contact the Chief Medical Officer ("CMO") at Kern Valley, who would refer the inmate's case to the inmate's

---

[3] The parties dispute whether Plaintiff's cell at Kern Valley was ADA-compliant for his disability status. See Pl.'s Opp'n to Defs.' Mot. for Summ. J. at p. 9-12. Although this dispute is relevant to the allegations here, Plaintiff is not bringing an ADA claim in this action based on whether he was housed in an ADA-compliant cell at Kern Valley.

1   primary care provider to verify that the inmate had been placed in an appropriate wheelchair

2   designation. (Id.) The primary care provider would then assess the inmate and determine which

3   appliances were appropriate. (Id.) Defendant Keldgord further contends that he referred

4   numerous inmates to the CMO at Kern Valley for this type of evaluation. (Id.) In this case,

5   Defendant Keldgord alleges that he contacted the CMO so that Plaintiff could be referred for an

6   evaluation by his primary care provider, to resolve what appeared to be an inconsistency or

7   classification issue with Plaintiff. (Id. at ¶ 6.)

8       Defendant J. Akanno, M.D., was employed by CDCR as a physician at Kern Valley

9   during the relevant events, and was one of the primary care physicians who treated Plaintiff for

10  his various conditions, including his complaints of chronic (long term) back pain. (Akanno Decl.,

11  ECF No. 90-3, ¶¶ 2-3.) According to Defendant Akanno, in December 2007, he was asked to

12  confirm Plaintiff's disability status by the CMO and Defendant Keldgord. (Id. at ¶ 22.)

13  Defendant Akanno was informed that the institution was trying to ensure that the ambulatory

14  devices given to inmates were consistent with their disability status. (Id.)

15      Defendant Akanno evaluated Plaintiff on December 18, 2007. In Defendant Akanno's

16  progress notes from the December 18, 2007 examination, he wrote, "Inmate being at the request

17  of AW Robert Keldgord and the CMO regard his DPW status. Should not be DPO, and so no

18  need for a walker." (12/18/2007 Progress Notes, ECF No. 90-3, p. 81.) Defendant Akanno

19  contends, without contradiction by Plaintiff, that Plaintiff stated during the examination that he

20  used his wheelchair all the time, and that he only used his walker to build standing ability.

21  (Akanno Decl. ¶ 23.) Defendant Akanno also told Plaintiff that a walker is not for exercises. (Id.)

22  Further, Plaintiff never informed Defendant Akanno that a walker was necessary for him to

23  mobilize in his cell or anywhere else in the prison. (Id.)

24      According to Defendant Akanno, based on his discussion with Plaintiff and his

25  knowledge of Plaintiff's medical history, he confirmed that Plaintiff was a full-time wheelchair

26  user (DPW), and Plaintiff's walker was discontinued because it was not medically necessary.

27  (Akanno Decl. ¶ 23.) Specifically, on December 18, 2007, Defendant Akanno filled out a

28  Disability Placement Program form (CDC 1845) confirming that Plaintiff was DPW. (Id.)

1        **b.      2008 Events**

2        On March 3, 2008, an examiner investigating Plaintiff's allegations in his December 7,

3   2007 accommodation request that his cell presented dangerous conditions, spoke with Defendant

4   Keldgord. (March 4, 2008 Directors Level Appeal Decision, ECF No. 85-4, p. 48.) Defendant

5   Keldgord stated that Plaintiff's cell "is built and arranged differently than some DPW cells at

6   different institutions," but also stated that the measurements of the cell provided enough space to

7   turn and maneuver. (Id.) After measuring the cell with Defendant Keldgord, the examiner found

8   the cell met the requirements of the ADA. (Id.) Defendant Keldgord also stated that he discussed

9   Plaintiff's options with him in maneuvering and showed him how it could be done. (Id.) On

10  March 4, 2008, Plaintiff's accommodation request was denied.

11       On June 1, 2008, Plaintiff wrote a letter to the U.S. Department of Justice, as the IAC

12  ADA Representative, discussing the denial of his ADA-accommodation request, and his

13  allegations of dangerous, non-compliant cell conditions. (June 1, 2008 Letter, ECF No. 85-4, p.

14  46.) Specifically, Plaintiff stated in the letter that "the purported ADA cells at KVSP" contain

15  "fixed lockers [that] have sharp edges that face the lower bunk only approximately 40" away."

16  (Id.) Plaintiff further stated in the letter that if a prisoner "takes a tumble" when transferring from

17  their wheel chair to their bunk, they would hit the sharp edges of the fixed lockers, presenting a

18  dangerous condition in the cells. (Id.)

19       Plaintiff asserts that by August of 2008, he began to be subjected to materially adverse

20  conduct by prison officials. The conduct included that he was delayed or denied his release for

21  work assignments, denied access to the IAC, and delayed or denied access to timely medical

22  treatment. (First Am. Compl. ¶¶ 36-38.)

23       At this time, Defendants Campas and Covarrubias were employed by CDCR as Floor

24  Officers on A Yard, Building 1. (Campas Decl., ECF No. 80-3, ¶ 2; Covarrubias Decl., ECF No.

25  80-4, ¶ 2.) They both generally worked on second watch between 6 a.m. and 2 p.m. (Id.)

26  According to Defendants Campas and Covarrubias, as Floor Officers they were not responsible

27  for releasing any inmate, including Plaintiff, to work assignments, medical appointments, yard

28  time, or IAC meetings. (Campas Decl. ¶ 10; Covarrubias Decl. ¶ 9.) Instead, they contend that

1  the Control Booth Officer released inmates from their cells to attend work assignments, medical

2  appointments, yard time, or IAC meetings. (Id.) Defendants Campas and Covarrubias further

3  contend that they did not request or instruct anyone at KVSP to change or deny Plaintiff's access

4  to showers, to deny or delay his release for work assignments, to deny his access to the upper

5  yard at KVSP, or to deny his access to medical care or appointments. (Id.)

6      Plaintiff also admits that with regard to his pain medication, Licensed Vocational Nurse

7  Sauceda, a non-party to this action, changed his prescriptions for pain medication. (Pl.'s Depo.

8  189:24-190:15.) The parties agree that Defendants Campas and Covarrubias were not involved in

9  failing to provide Plaintiff with pain medication. (Id. at 117:11-14.) Defendants Campas and

10  Covarrubias further contend that they complied with all Comprehensive Accommodation

11  Chronos issued to Plaintiff. (Campas Decl. ¶ 13; Covarrubias Decl. ¶ 11.)

12      Beginning in August 2008, Plaintiff filed misconduct forms with Kern Valley regarding

13  the alleged conduct by Defendants and the other prison officials. (Pl.'s Depo. 12:19-13:4.) Later,

14  on September 4, 2008, Plaintiff wrote a letter to Defendant Hedgpeth, the Warden of Kern

15  Valley, stating that there was the widespread harassment of IAC members by correctional

16  officers and supervisory staff, that prison staff were challenging IAC members to become

17  combative, and were denying and delaying the release of IAC members from their housing units,

18  daily activities, and work assignments. (First Am. Compl. ¶37.)

19      Defendant Hedgpeth declares that he would generally refer letters from inmates

20  concerning ADA issues to the Chief Deputy Warden or the ADA Coordinator (at that time was

21  Defendant Keldgord). (Decl. of A. Hedgpeth ("Hedgpeth Decl."), ECF No. 80-3, ¶ 3.) Defendant

22  Hedgpeth further declares that he does not recall reviewing any correspondence from Plaintiff or

23  responding to Plaintiff, either in writing or verbally (prior to this lawsuit). (Id.) Plaintiff agrees

24  that Defendant Hedgpeth did not respond to his communication, and testified that he did not

25  discuss the 2007 Hedgpeth lawsuit with Defendant Hedgpeth. (Pl.'s Depo. 65:17-67:16.)

26      Defendant Hedgpeth also declares that he did not request or instruct anyone at Kern

27  Valley to change or deny Plaintiff's access to showers, to deny or delay his release from work

28  assignments, to deny Plaintiff access to the upper yard at Kern Valley, or to deny Plaintiff access

to medical care or appointments. (Hedgpeth Decl. ¶ 4.) Plaintiff does not recall any adverse action taken against him by Defendant Hedgpeth, or any statements by Defendant Hedgpeth indicating that he intended to retaliate against Plaintiff for filing the Hedgpeth lawsuit. (Pl.'s Depo. 65:24:66:4, 66:19-67:16.)

On or about September 24, 2008, Plaintiff submitted Government Claim G578722 to the California Victim Compensation and Government Claims Board. (Government Claim G578722, ECF No. 80-4, pp. 15-18.) Plaintiff alleged in that Government Claim that on July 25, 2008, he was refused medical treatment by Correctional Officer I. Jaime and LVN M. Koonc, who are also non-parties to this action, that he was denied his medical shower, and that he was denied pain management. (Id.)

On October 7, 2008, prison officials met with Plaintiff and another IAC member to discuss disabled inmates' grievances. (First Am. Compl. ¶ 40.) Plaintiff contends that during this discussion, he and the other member were asked to act as informants and report on the conduct of the IAC, and he refused. (Pl.'s Depo. 68:15-21,72:1-9, 77:5-14, 188:3-16, 189:21-23.) Days later, Kern Valley staff informed Plaintiff that he would no longer be a member of the IAC, as the ADA chair position had been eliminated. (Pl.'s Depo. 30:8-14, 76:12-19, 77:15-24, 177:10-18, 187:9-11, 188:8-22.) He was also told that the schedule of his medical showers had been changed. (Pl.'s Depo. 105:19-106:20, 187:10-188:22.)

Regarding Plaintiff's removal from the IAC, Plaintiff does not know who made the decision to remove him from that committee. (Pl.'s Depo. 182:7-17.) Plaintiff testified that he believes was removed from the IAC because he refused to provide Defendant Keldgord and the captain of the facility with information about activities (that did not concern ADA issues) occurring at the facility. (Pl.'s Dep. 68:15-70:20, 72:3-73:10, 76:8-77:24.)

However, the parties agree that Defendant Keldgord was not involved in the formation, composition, or supervision of IACs at Kern Valley, and did not appoint inmates to this body. (Keldgord Decl. ¶ 7.)  The IAC at Kern Valley was overseen by Captain P. Sanchez, who was not supervised by Defendant Keldgord. (Id. at ¶ 8.)

///

1   Defendant Keldgord denies directing Captain Sanchez or anyone else to remove Plaintiff

2  from the IAC. (Id.) Defendant Hedgpeth also denies requesting or instructing anyone to remove

3  Plaintiff from the IAC. (Hedgpeth Decl. ¶ 4.)

4   On October 9, 2008, Lieutenant Cabrera told Plaintiff that Cabrera had requested that

5  Plaintiff's primary care provider change Plaintiff's shower chrono so that Plaintiff was forced to

6  shower in the morning. (Pl.'s Depo. 186:10-187:11.) Plaintiff contends that after Lieutenant

7  Cabrera had the shower chrono changed, Defendants Campas and Covarrubias came to his cell

8  and demanded that Plaintiff shower in the morning. (Id. at 106:13-20.) Also, although Plaintiff's

9  Comprehensive Accommodation Chrono did not call for morning cell feed at KVSP in 2008,

10 (Comprehensive Accommodation Chronos, ECF No. 80-4, pp. 68-70), Plaintiff testified that he

11 had an early a.m. cell feed accommodation at Kern Valley, because he had that accommodation

12 at Salinas Valley State Prison. (Pl.'s Depo. 104:2-10.) Plaintiff contends that Defendants Campas

13 and Covarrubias requested a change in his morning cell feed routine in October 2008 because

14 they did not want to "continue catering to [Plaintiff]." (Id. at 104:2-105:14.) Sometime that

15 month, Plaintiff filed one or two CDCR 1824s, alleging retaliatory conduct. (Depo at 85:16-

16 86:20.)

17   Plaintiff alleges that in November, he was denied pain medications each day for three

18 days straight, and denied access to his medical showers. (Pl.'s Depo. 183:11-15.) Plaintiff further

19 alleges that at one point, the pain was so bad, he became unconscious, striking his head on his

20 footlocker as he fell from his bed. (Pl.'s Depo. 123:1-124:21, 175:20-21, 182:25-183:15.)

21 Plaintiff's migraines increased in frequency after the fall. (First Am. Compl. ¶ 44.)

22   Plaintiff alleges that he suffered horribly as correctional officers refused to give him pain

23 medication for five days straight in the month of December 2008. (First Am. Compl. ¶ 47.)

24 Plaintiff attempted to amend Government Claim G578722 by a letter dated December 2, 2008,

25 alleging that being denied pain management and a "medically necessary daily hot shower" had

26 caused an injury when he hit his head on a locker, and that he was subjected to harassment and

27 retaliation. (Pl.'s Dec. 2, 2008 Letter, ECF No. 1-2, at p. 17.) The California Victim

28 Compensation and Government Claims Board ("Government Claims Board") returned Plaintiff's

1    amended claim to him by a letter dated December 24, 2008. (Government Claims Board Dec. 24,

2    2008 Letter, ECF No. 1-2, at p. 19.) The Government Claims Board also informed Plaintiff by a

3    letter dated December 26, 2008, that Government Claim G578722 had been rejected.

4    (Government Claims Board Dec. 26, 2008 Letter, ECF No. 1-2, at p. 18.)

5            **c.      2009 Events**

6            In January of 2009, Plaintiff filed another CDCR 1824 Form, alleging disability

7    discrimination and other conduct. (Pl.'s Depo. 38:5-11, 129:20-131:5.) Plaintiff contends that

8    shortly after submitting his form, he discovered that his morning meal, delivered by Defendants

9    Campas and Covarrubias, smelled of cleaning chemicals. (Pl.'s Depo. 47:24-48:7, 99:14-

10   103:14.) That morning, Plaintiff awoke to find that he couldn't pull himself out from his bed and

11   had soiled himself. (Pl.'s Depo. 51:13-17, 99:14-103:14, 132:21-24.) Plaintiff was removed from

12   his cell and taken to the correctional treatment center. (Id.) When Plaintiff returned to his cell, he

13   noticed that his morning meal smelled of cleaning chemicals. (Id.) Plaintiff contends that only

14   the kitchen staff, a porter, and Defendants Campas and Covarrubias had access to his food tray.

15   (Id.) Defendants Campas and Covarrubias dispute that they placed any foreign substances,

16   including disinfectant, in Plaintiff's food tray. (Campas Decl. ¶ 11; Covarrubias Decl. ¶ 10.)

17          In February of 2009, Simmons filed another 1824 Form, alleging retaliation.

18   (Pl.'s Depo. 38:15-18.) According to Plaintiff, the retaliation continued, and he was denied

19   medical showers at least eight times in that month. (First Am. Compl. ¶¶ 50-51.)

20          Since these events, Plaintiff has been moved from Kern Valley to the California Medical

21   Facility. (Pl.'s Depo 2:20-24.) On December 17, 2009, Plaintiff filed a complaint against the

22   prison official Defendants and others concerning the claims at issue here, in the Superior Court

23   of California, County of Kern. (Kern County Superior Court Compl., ECF No. 1-2.) Plaintiff

24   made prior attempts to file the Complaint in this action in Kern County Superior Court but these

25   attempts were returned to him due to deficiencies in the court papers, causing Simmons to revise

26   the Complaint and civil case cover sheet. (Pl.'s Depo. 59:13-21; 161:17-162:13; 162:23-164:5.)

27   On March 29, 2010, that action was removed to the United States District Court for the Eastern

28   District of California, Fresno Division. (Notice of Removal of Action, ECF No. 1.)

2.     California Disabled Persons Act and Unruh Civil Rights Act Claims

Since Plaintiff does not oppose the dismissal of his claims under the CDPA and UCRA, the Court will address them first. The prison official Defendants argue that because Plaintiff's complaint in this action was not filed within six months of the rejection of his government claims, he failed to comply with the California Government Claims Act, Cal. Gov. Code §§ 900 *et seq.* Since compliance is a prerequisite to bringing Plaintiff's tort-based injury claims under the CDPA and UCRA, the prison official Defendants argue that his failure to comply is fatal to these causes of action, and they are therefore entitled to summary judgment on those claims.

"As a prerequisite for filing suit for 'money or damages' against a public entity, the California Government Claims Act requires presentation of a claim to the public entity." Gen. Sec. Servs. Corp. v. Cnty. of Fresno, 815 F. Supp. 2d 1123, 1131 (E.D. Cal. 2011); see Cal. Gov't Code §§ 911.2, 945.4; see also State of California v. Superior Court ("Bodde "), 32 Cal. 4th 1234, 1240–44, 13 Cal. Rptr. 3d 534, 90 P.3d 116 (2004). The prefiling requirement covers claims sounding in tort. See City of Stockton v. Superior Court, 42 Cal. 4th 730, 738, 68 Cal. Rptr. 3d 295, 171 P.3d 20 (2007). Claims involving death or injuries to a person or personal property must be presented no later than six months after the accrual of the claim. Cal. Gov't Code § 911.2(a). The date of accrual is that which would pertain under the statute of limitations if the dispute were between private litigants. See Shirk v. Vista Unified Sch. Dist., 42 Cal. 4th 201, 208–09, 64 Cal. Rptr. 3d 210, 164 P.3d 630 (2007). The failure to timely present a claim for money or damages to a public entity bars a plaintiff from bringing suit against that entity. Bodde, 32 Cal. 4th at 1240, 13 Cal.Rptr.3d 534, 90 P.3d 116. "The statute of limitations for commencing a government tort claim action is not tolled by virtue of a plaintiff's imprisonment." Moore v. Twomey, 120 Cal. App. 4th 910, 914, 16 Cal. Rptr. 3d 163, 165 (2004) (citing Cal. Code Civ. Proc., § 352.1(b)).

As discussed above in the factual summary, the parties agree that the Government Claims Board informed Plaintiff by a letter dated December 26, 2008, that his Government Claim G578722 had been rejected. The parties further agree that, although Plaintiff made previous attempts, his complaint concerning the claims at issue here was not filed until December 17,

1   2009, nearly a year after his claim was rejected. Thus, since Plaintiff admits that his complaint in

2   this action was filed more than six months after the government claim was rejected, he is

3   procedurally barred from pursuing his state law claims. Consequently, summary judgment

4   should be granted in favor of the prison official Defendants on Plaintiff's CDPA and UCRA

5   claims.

6           3.     <u>Americans with Disabilities Act Claims</u>

7           **a.**    **Warden Hedgpeth**

8       Next, the Court turns to Plaintiff's retaliation claims under the ADA against the prison

9   official Defendants. First, Defendants argue that the undisputed facts show that Defendant

10  Hedgpeth did not take any adverse action against Plaintiff based on him asserting his rights

11  under the ADA. Therefore, they argue that summary judgment should be granted in Defendant

12  Hedgpeth's favor on Plaintiff's ADA retaliation claim.

13      A prima facie case of retaliation under the ADA requires a plaintiff to show: "(1)

14  involvement in a protected activity, (2) an adverse . . . action and (3) a causal link between the

15  two." <u>Coons v. Sec'y of U.S. Dep't of Treasury</u>, 383 F.3d 879, 887 (9th Cir. 2004) (quoting

16  <u>Brown v. City of Tucson</u>, 336 F.3d 1181, 1187 (9th Cir. 2003)). If plaintiff establishes a prima

17  facie case, the defendant has the burden to 'present legitimate reasons for the adverse … action."

18  <u>Id</u>. (quoting <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 928 (9th Cir. 2000)). If the defendant

19  satisfies this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether

20  the reason advanced by the defendant was a pretext. <u>Id</u>

21      Plaintiff argues that he has presented a prima facie case of retaliation against Defendant

22  Hedgpeth based on his removal from the IAC, which Plaintiff asserts was done either because of

23  his 2007 <u>Hedgpeth</u> lawsuit or because of his September 4, 2008 letter. The Court does not find

24  that Plaintiff has established a prima facie case here, and instead finds that Defendants have

25  carried their burden of establishing a lack of such a case.

26      First, the evidence does not support Plaintiff's contention that Defendant Hedgpeth was

27  made aware of the 2007 <u>Hedgpeth</u> lawsuit before Plaintiff was removed from the IAC. As noted

28  above, the court records from the 2007 <u>Hedgpeth</u> lawsuit show that Defendant Hedgpeth was

dismissed from that action before service of the summons and complaint was initiated. Plaintiff

has submitted nothing to support his allegation that Defendant Hedgpeth was otherwise made

aware of the lawsuit prior to Plaintiff's removal from the IAC. Thus, Plaintiff has failed to raise a

genuine dispute of material fact as to whether Defendant Hedgpeth knew about the 2007

Hedgpeth lawsuit, and retaliated against him based on that protected conduct. See Pratt v.

Rowland, 65 F.3d 802, 808 (9th Cir.1995) (the relevant defendants must have knowledge of the

plaintiff's protected activity).

Second, although Plaintiff has raised a genuine dispute of material fact as to whether

Defendant Hedgpeth received his September 4, 2008 letter,[4] he has not presented any evidence

that Defendant Hedgpeth was later involved in Plaintiff's removal from the IAC. Plaintiff asserts

that no evidence is required because under California prison regulations—specifically provisions

of Section 3230(a) and (b) of Title 15 of the California Code of Regulations—only the warden

could eliminate the ADA position on the IAC or remove Plaintiff from that committee.

The prison regulations that Plaintiff relies upon, which concern the Establishment of

Inmate Advisory Councils, provide in pertinent part as follows:

> (a) Each warden shall establish an inmate advisory council which is representative
> of that facility's inmate ethnic groups. At the discretion of the warden,
> subcommittees of the council may also be established to represent subfacilities or
> specialized segments of the inmate population.
> …
> (b) An inmate's eligibility for nomination, election and retention as an inmate
> advisory council representative shall be limited only by the inmate's ability to
> effectively function in that capacity as determined by the warden.
> …

As Defendants argue, although this regulation sets forth criteria for an inmate's eligibility for

membership in an IAC, reliance on this regulation does not provide factual evidence that

---

[4] Defendants contend that Plaintiff is required to produce evidence that Defendant Hedgpeth actually reviewed Plaintiff's September 4, 2008 letter, since Defendant Hedgpeth submitted a declaration stating that he generally referred such letters to other prison officials. However, at the summary judgment stage, Plaintiff's evidence that he submitted a letter to Defendant Hedgpeth is sufficient to establish a material issue of fact as to whether Hedgpeth received the letter and was aware of the complaints made in the letter. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) (despite prison officials' denial of knowledge of prisoner's medical condition, genuine issue of material fact existed when prisoner submitted sworn evidence of sending letters to put officials on notice); see also Moore v. Jackson, 123 F.3d 1082, 1087 (8th Cir. 1997) (plaintiff entitled to reasonable inference that prison official aware of matters described in grievances).

1  Defendant Hedgpeth did, in fact, make any decision to remove him from the IAC. Instead, the

2  evidence presented concerning Plaintiff's removal from the IAC is Defendant Hedgpeth's

3  declaration that he did not request or instruct anyone to remove Plaintiff from the IAC, and

4  Plaintiff's testimony that he does not know who made the decision to remove him from that

5  committee. Plaintiff also specifically testified that he does not recall any adverse action taken

6  against him by Defendant Hedgpeth.

7      Moreover, Plaintiff has not presented evidence that he was removed from the IAC

8  *because of* his September 4, 2008 letter. Plaintiff testified that after the letter was sent, he met

9  with other prison officials on October 7, 2008, when he was asked to become an informant. He

10 further testified that he believes he was removed from the IAC a few days later because of this

11 refusal. Thus, Plaintiff himself speculates that his removal from the IAC was not due to any

12 protected conduct, but was due to his refusal to become an informant.

13     Since Plaintiff has not created a genuine issue of material fact regarding whether

14 Defendant Hedgpeth retaliated against him for protected conduct under the ADA, the Court

15 recommends that summary judgment be granted in Defendant Hedgpeth's favor on that claim.

16              **b.    Associate Warden and ADA Coordinator Keldgord**

17     Defendants argue that the undisputed facts show that Defendant Keldgord did not take

18 any adverse action against Plaintiff, and therefore Plaintiff cannot establish that Keldgord

19 retaliated against him in violation of Title V of the ADA. Plaintiff argues that he has established

20 a genuine issue of material fact regarding whether Defendant Keldgord had Plaintiff's walker

21 removed in retaliation for Plaintiff's ADA-based complaints. The Court disagrees with Plaintiff,

22 and finds that he has not presented a genuine issue of material fact regarding whether Defendant

23 Keldgord retaliated against him.

24     First, Defendants argue that Plaintiff never pleaded that he was retaliated against by

25 removing his walker and has raised this issue for the first time in his opposition to summary

26 judgment. Therefore, Plaintiff cannot raise this issue as the basis of a retaliation claim. The Court

27 agrees. Plaintiff Third Amended Complaint, the operative complaint in this case, does not

28 discuss the removal of Plaintiff's walker by Defendant Keldgord, even though Plaintiff would

have been aware of this alleged fact when he filed that pleading. Thus, this new un-pleaded allegation cannot raise a genuine issue of material fact here. See Wasco Prods., Inc. v. Southwall Tech., Inc., 435 F.3d 989, 992 (9th Cir. 2006) (rejecting allegations appearing for the first time in a response to a summary judgment motion and explaining that "summary judgment is not a procedural second chance to flesh out inadequate pleadings") (internal quotation omitted); see also Shilling v. Crawford, Case No. 205CV-00889-PMP-GWF, 2007 WL 2790623, at *9 n.2 (D. Nev. Sept. 21, 2007) (rejecting plaintiff's argument that allegedly illegal contract raised for the first time in response to defendants' motions for summary judgment precluded summary judgment) (citing Wasco Prods., Inc., 435 F.3d at 992).

Second, Defendants argue that even if these additional allegations were properly raised, Plaintiff has not provided evidence that Defendant Keldgord in fact understood Plaintiff's cell to be inaccessible by wheelchair, and thus removed Plaintiff's walker as an adverse action. Defendants contend, instead, that no adverse action was taken here by the removal of the walker.

The evidence supports Defendants' arguments. Defendant Keldgord declared that he referred Plaintiff for an evaluation by his primary care provider because his possession of a walker appeared to be inconsistent with his mobility designation. Also, according to the March 4, 2008 Directors Level Appeal Decision relied upon by Plaintiff, although Defendant Keldgord admitted that Plaintiff's cell was built and arranged differently than some DPW cells at other institutions, Defendant Keldgord participated in measuring Plaintiff's cell to show that it was nevertheless ADA-compliant, and that Plaintiff could maneuver in it with his wheelchair. The uncontested evidence also shows that Plaintiff was confirmed by Dr. Akanno to have a DPW designation, and had no medical need for a walker, which was a valid, non-discriminatory basis to remove Plaintiff's walker.

Plaintiff argues that there is a genuine dispute regarding the foregoing factual contentions. According to Plaintiff, Defendant Keldgord actually knew that Plaintiff's cell was not a DPW cell or ADA-complaint, and that Plaintiff therefore required a walker to maneuver in his cell. In support, Plaintiff cites the ADA/Section 504 Design Guide: Accessible Cells in

Correctional Facilities, dated February 8, 2005 ("Design Guide") from the U.S. Department of Justice ("DOJ"), his June 1, 2008 letter to the DOJ, and photographs of his cell.

The Design Guide Plaintiff relies upon was not submitted as evidence in this case, nor was any citation provided. A district court has the discretion to decline to consider evidence which was not properly submitted in support of a summary judgment motion or opposition. See Ahktar v. Mesa, 698 F.3d 1202, 1208 (9th Cir. 2012). Nevertheless, the Court finds that even if it considers the Design Guide in the light most favorable to Plaintiff, it would not change the result in this case, as explained below.

Based upon the title and date given, the Court has located the Design Guide on the DOJ Civil Rights Division website for ADA Technical Assistance Materials, which can be accessed at https://www.ada.gov/ta-pubs-pg2.htm (last visited January 13, 2017). The relevant specifications in the Design Guide to Plaintiff's argument concern bed transfer space. The Design Guide states that a "30-inch by 48-inch clear floor space facilitates transfer from a wheelchair to a bed." (Design Guide, at p. 5.) The Design Guide also provides an illustration showing that adequate bed transfer space consists of at least 30-inches of clear space from the edge of the bed to the nearest piece of furniture, and at least 48-inches of space along the side of the bed, so that a person in a wheelchair can be positioned parallel to the bed for transfer. (Id.)

Plaintiff's June 1, 2008 letter contends that the ADA cells are dangerous because they contain fixed lockers facing the lower bunk approximately 40-inches away, and that if an inmate falls during bed transfer, the inmate could hit the sharp edges of the locker. Even assuming Plaintiff's representations in the letter are true, this evidence does not show that the cells were not compliant with the Design Guide, which only requires at least 30-inches of space from the edge of the bed to the nearest piece of furniture. Thus, as Defendants argue, even when considering this evidence in the light most favorable to Plaintiff, it does not create a material dispute of fact regarding whether Defendant Keldgord knew that the cell was not maneuverable for a wheelchair-bound inmate. Nor can a jury reasonably infer from this evidence that Plaintiff instead required a walker to maneuver in this situation, such that Defendant Keldgord could be found to have retaliated against Plaintiff by having his walker removed. Plaintiff has submitted

1  no evidence regarding the maneuverability of his cell with a walker versus a wheelchair, or

2  evidence showing that Defendant Keldgord had knowledge of any difference in Plaintiff's ability

3  to maneuver with a walker versus a wheelchair in Plaintiff's cell.

4         The photographs that Plaintiff relies upon also do not support his argument that

5  Defendant Keldgord retaliated against him by removing his walker. The photographs are not

6  clear and only show portions of the cell from various angles, some furniture and personal articles

7  arranged in the cell, portions of the bunk beds, and a view of the cell through a partially-opened

8  cell door. The floor space is also only partially visible. Plaintiff's arguments rely on a lack of

9  clear space for maneuvering in the cell, but the photographs do not show that a wheelchair-bound

10  inmate could not maneuver in the cell as well as an inmate using a walker. There is nothing in

11  the photographs indicating the dimensions of the cell or open floor space. Thus, the photographs

12  could not reasonably be used by a trier of fact to determine that Defendant Keldgord knew the

13  cell could not be maneuvered in using a wheelchair, that the cell could be maneuvered in using a

14  walker, or that Defendant Keldgord therefore retaliated against Plaintiff by having the walker

15  removed. [5]

16         Based on the foregoing, Plaintiff has not shown any material issue of fact regarding

17  whether Defendant Keldgord took any adverse action against Plaintiff. As a result, the Court

18  recommends that summary judgment be granted in Defendant Keldgord's favor on Plaintiff's

19  claim.

20         **c.      Correctional Officers Campas and Covarrubias**

21         Defendants argue that Plaintiff's retaliation claims against Defendants Campas and

22  Covarrubias must be dismissed because Plaintiff cannot show that either of them took any

23  adverse action against Plaintiff. Defendants also assert that Plaintiff admits that some of the

---

24  [5] Although Plaintiff cites these photographs in his opposition, (ECF No. 85, pp. 10-11), he did not submit
25  the photographs themselves. The photographs were not included among the exhibits submitted in support
   of Plaintiff's opposition. (ECF No. 85-4.)

26
   However, pursuant to Local Rule 133(j), Defendants lodged all three volumes of Plaintiff's
27  deposition transcripts in this case, including all exhibits, for the Court's consideration. (ECF No. 82.)
   Based upon Plaintiff's description of the photographs, the Court was able to locate them and fully
28  considered them. (Pl.'s Dep., Volume II, Ex. 10.)

1   alleged adverse actions he contends Defendants Campas and Covarrubias were involved in was

2   not caused by his protected activity, but was instead done for other reasons.

3        In response, Plaintiff argues that he has presented evidence that he was retaliated against

4   by some prison officials in several respects, including by non-parties, and that he will "stipulate"

5   that these non-parties engaged in the retaliatory actions, because "CDCR will be ultimately

6   responsible." (ECF No. 85, p. 13.) Defendants assert that they in fact do not concede that any

7   CDCR employee retaliated against Plaintiff, that CDCR has been dismissed as a party from this

8   case with prejudice for the failure to state a claim, and that this argument does not meet

9   Plaintiff's burden of proof to avoid summary judgment being granted in favor of Defendants

10  Campas and Covarrubias. The Court agrees with Defendants; the issue here is whether

11  Defendants Campas and Covarrubias are entitled to summary judgment, which is not based on

12  whether any non-parties may have retaliated against Plaintiff in violation of the ADA.

13       Regarding Defendants Campas and Covarrubias, Plaintiff asserts that he has presented

14  sufficient evidence to create a genuine issue of material fact regarding whether they put cleaning

15  chemicals in his food after he filed a CDCR 1824 Form in January 2009. Although Plaintiff

16  admits that Defendants Campas and Covarrubias may not have put any chemicals in his food and

17  it may have been done by inmates who had access to his food tray, he argues that the Defendants

18  would nevertheless be responsible for any actions of the inmates.

19       Plaintiff's contentions are flawed, and he has failed to create a genuine issue of material

20  fact here. Plaintiff's allegations that Defendants Campas and Covarrubias put cleaning chemicals

21  in his food are conclusory and based on mere speculation, and he admits that they may not have

22  been directly involved. These speculative contentions unsupported by facts are insufficient to

23  defeat summary judgment. See Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th

24  Cir.) (conclusory allegations unsupported by factual data cannot defeat summary judgment),

25  amended, 340 F.3d 767 (9th Cir. 2003); Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988)

26  (same). See also Jackson v. Chappell, Case No. C 14-3108 CRB (PR), 2017 WL 57304, at *7

27  (N.D. Cal. Jan. 5, 2017) (granting summary judgment on inmate's claims that correctional

28  officers poisoned him after he became ill from eating meals served by them, since allegations

1   were merely speculative and unsupported by factual evidence, such as witness accounts). Even

2   assuming Plaintiff's testimony that his food smelled of chemicals, and that Defendants Campas

3   and Covarrubias were among a group of people who had access to his food, are true, Plaintiff has

4   presented no evidence here from which a reasonable jury could determine that either of those

5   Defendants actually put the chemicals in Plaintiff's food.

6        Plaintiff's argument that Defendants Campas and Covarrubias are responsible for the

7   actions of an inmate who may have put cleaning chemicals in his food has no merit. Plaintiff has

8   cited no law in support of his contention that these Defendants are vicariously liable for the

9   conduct of any inmate porters or kitchen staff who may have put chemicals in his food.

10  Moreover, the record contains no evidence from which a reasonable jury could infer that

11  Defendants Campas and Covarrubias were even aware that cleaning chemicals were placed in

12  Plaintiff's food tray.

13       For these reasons, the Court finds that Plaintiff has failed to present a genuine issue of

14  material fact regarding whether Defendants Campas and Covarrubias retaliated against him for

15  protected conduct under the ADA. As a result, the Court recommends summary judgment be

16  granted in their favor on Plaintiff's claims.

17       **C.    Defendant Akanno's Motion for Summary Judgment**

18           1.    Third Amended Complaint Allegations Against Defendant Akanno

19       Plaintiff alleged that Defendant Akanno was a primary care physician responsible for

20  Plaintiff's treatment and medical needs. (Third Am. Compl. ¶ 7.) As noted above, Plaintiff

21  further alleged that at various times between August of 2008 and February of 2009, he was

22  denied pain medications and medical showers, causing him injury, in violation of the ADA,

23  CDPA, and UCRA.

24           2.    California Disabled Persons Act and Unruh Civil Rights Act Claims

25       Defendant Akanno moves for all of Plaintiff's claims against him to be dismissed on

26  summary judgment grounds, as Plaintiff concedes that he failed to comply with the Government

27  Claims Act.  Regarding Plaintiff's claims under the CDPA and UCRA, as explained above,

28  Plaintiff admits that he is procedurally barred from pursuing those claims because his claims

1  were filed more than six months after his government claims were rejected.  <u>Bodde</u>, 32 Cal. 4th

2  at 1240, 13 Cal. Rptr. 3d 534, 90 P.3d 116. (ECF No. 85, p. 14.) Therefore, summary judgment

3  should be granted in favor of Defendant Akanno on Plaintiff's CDPA and UCRA claims, on

4  those grounds.

5         3.   <u>Americans with Disabilities Act Claims</u>

6        **a.**   **Undisputed Facts**

7       Plaintiff was housed at Kern Valley from October 14, 2005, until he was transferred to

8  Pleasant Valley State Prison on April 8, 2009. (Def. Akanno's Separate Statement of Undisputed

9  Facts, ECF No. 90-1, ("SSUF") ¶1.) Dr. Akanno has been employed by CDCR for the past 13

10  years, and worked at Kern Valley from 2005-2015. (SSUF ¶ 2.)

11       Dr. Akanno first began treating Plaintiff at KVSP in December 2005. Based upon his

12  discussion and evaluation of Plaintiff, Dr. Akanno prescribed him Vicodin, Indocin (similar to

13  Ibuprofen), and continued his other medication for high blood pressure and hypertension. (SSUF

14  ¶ 5.) In February 2006, Plaintiff complained about back pain due to surgery. Although Plaintiff

15  was taking Vicodin, he complained that it was not working. Dr. Akanno adjusted the medication

16  regimen by prescribing Roxicet (acetaminophen and oxycodone) to be taken twice a day. (SSUF

17  ¶ 6.)

18       Throughout 2006, Dr. Akanno adjusted Plaintiff's medication based on his complaints of

19  back pain. For example, Dr. Akanno added Neurontin (Gabapentin) to Plaintiff's pain regimen to

20  be taken twice a day. This medication is commonly used to treat neuropathic pain. Dr. Akanno

21  increased Plaintiff's doses of Roxicet and Neurontin in May 2006. In October 2006, Dr. Akanno

22  increased Plaintiff's dosage of Hydrocodone/APAP (acetaminophen.) (SSUF ¶ 7.)

23       On January 9, 2007, Dr. Akanno renewed Plaintiff's medications and renewed various

24  chronos for his back pain. These included providing Plaintiff with an extra pillow, a pressure

25  mattress, and daily showers after 7:00 p.m., per Plaintiff's request. (SSUF ¶ 8) Dr. Akanno also

26  renewed Plaintiff's oxycodone on January 17, 2007 and January 23, 2007. (SSUF ¶¶ 9-10.)

27       On or around February 22, 2007, Plaintiff submitted a Health Care Request form

28  indicating that his pain medication was about to run out and he wanted to see a doctor about

physical therapy. However, by this time, Dr. Akanno had already filled out a prescription to renew Plaintiff's pain medication to begin on February 23, 2007. Dr. Akanno renewed Plaintiff's medication again on February 27, 2007. (SSUF #11.) On March 2, 2007, Dr. Akanno also renewed Plaintiff's Roxicet. (SSUF ¶ 12.)

On April 13, 2007, Plaintiff requested a methadone prescription instead of oxycodone. Dr. Akanno prescribed Plaintiff Methadone to be taken twice daily. Dr. Akanno also referred Plaintiff to physical therapy. (SSUF ¶ 13.) On June 26, 2007, Plaintiff told Dr. Akanno that he had problems with constipation. This is a common symptom of chronic use of Methadone. Dr. Akanno thus decided to reduce Plaintiff's methadone prescription. (SSUF ¶14.)

On June 28, 2007, Dr. Akanno renewed Plaintiff's prescription for Roxicet for his pain. (SSUF ¶ 15.) On August 21, 2007, Plaintiff was seen and evaluated because he was requesting more pain medication. He stated that he stopped taking his medication. Plaintiff's current medications were continued and he was strongly advised to start taking his medication again. (SSUF ¶ 16.)

On October 2, 2007, Plaintiff told Dr. Akanno he was no longer taking Methadone. Dr. Akanno prescribed him oxycodone three times daily instead of two times daily to address Plaintiff's complaints of pain. (SSUF ¶ 17.) On November 8, 2007, Dr. Akanno provided Plaintiff with a referral to see a neurologist upon Plaintiff's request for his back pain. (SSUF ¶18.)

In December 2007, Dr. Akanno was asked to confirm Plaintiff's disability status by the Chief Medical Officer Lopez and Assistant Warden Kelgord, who was the ADA coordinator. Dr. Akanno was informed that the institution was trying to ensure that the ambulatory devices given to inmates were consistent with their disability status. (SSUF #19.) Dr. Akanno evaluated Plaintiff, who informed him that he used his wheelchair all the time, and that he only used his walker to build standing ability. Plaintiff never informed Dr. Akanno that a walker was necessary for him to mobilize in his cell or anyone else in the prison. Based on this discussion and knowledge of Plaintiff's medical history, Dr. Akanno confirmed that Plaintiff was a full-time wheelchair user (DPW), and Plaintiff's walker was discontinued because it was not medically

1   necessary. Dr. Akanno explained to Plaintiff that a walker is not for exercises. (SSUF ¶ 20.)

2       On December 18, 2007, Dr. Akanno filled out a Disability Placement Program Form

3   (CDC 1845) confirming that Plaintiff was DPW. The form indicated that Plaintiff should have a

4   lower bunk, no stairs, and no triple bunk. (SSUF ¶ 21.)

5       On January 15, 2008, Plaintiff had a neurological consultation with Dr. Young based on

6   Dr. Akanno's referral. The neurologist's recommendation was to provide Plaintiff with a MRI or

7   CT-scan, and continue with the same medication, which at the time was oxycodone. There was

8   no reference by Dr. Young that Plaintiff needed a walker. (SSUF ¶ 22.)

9       On January 29, 2008, Plaintiff was seen as a follow-up to his neurological consultation

10  and prescribed a MRI for his spine. (SSUF ¶ 23.) The request for a MRI was changed to a CT

11  scan based on the metal in Plaintiff's spine. (SSUF ¶ 24.)

12      On March 25, 2008, Plaintiff requested a new wheelchair cushion because he had

13  claimed that his previous cushion had been punctured. Dr. Akanno authorized Plaintiff to receive

14  a new wheelchair cushion. (SSUF ¶ 25.) On May 2, 2008, Plaintiff filled out a Health Care

15  Request form indicating that his CT-Scan had been cancelled and that he would like it re-

16  scheduled. He also believed that his pain medication would run out by May 6, 2008, and he

17  needed an appointment to renew his pain medication. (SSUF ¶ 26.) Dr. Akanno renewed

18  Plaintiff's oxycodone on that day. (SSUF ¶ 27.)

19      On May 7, 2008, Dr. Akanno provided a referral for a neurology electromyography

20  (EMG)/nerve conduction velocity test (NCV) to address Plaintiff's complaints of back pain.

21  Plaintiff refused this referral. (SSUF ¶ 28.) On May 27, 2008, Dr. Akanno renewed various

22  accommodation chronos for Plaintiff. These included an extra pillow, pressure relief mattress,

23  wheelchair cushion, and daily showers after 7:00 P.M. (SSUF ¶ 29.)

24      On or around June 6, 2008, Plaintiff received a CT scan of his lumbar spine. (SSUF ¶

25  30.) On June 19, 2008, Dr. Akanno saw Plaintiff following his CT scan and Dr. Akanno

26  provided Plaintiff with a referral to orthopedics. (SSUF ¶31.) On August 4, 2008, Plaintiff's

27  oxycodone was renewed. (SSUF ¶ 32.)

28      On August 18, 2008, Plaintiff was seen to follow-up on his complaints of back pain. It

1    was noted that Plaintiff had been taking oxycodone and APAP (also known as acetaminophen or

2    Paracetamol). Plaintiff was placed in the doctor's line. On August 19, 2008, Dr. Akanno renewed

3    Plaintiff's pain medications and instructed Plaintiff to return to doctor's line in 30 days. (SSUF ¶

4    33.)

5           Additionally, on September 1, 2008, Plaintiff was given Tylenol for his complaints of

6    pain. (SSUF ¶ 34.) On September 19, 2008, Dr. Akanno saw Plaintiff who requested an

7    appointment with the HCV (Hepatitis C) clinic. Plaintiff indicated that he was taking his

8    medication regularly and denied any additional pain. Dr. Akanno renewed his pain medication

9    and his blood pressure medication and scheduled Plaintiff for doctor's line in 8-10 weeks. (SSUF

10   ¶ 35.)

11          On October 17, 2008, Plaintiff was seen for an orthopedic telemedicine consultation with

12   Dr. Pierre Hendricks. Dr. Hendricks report indicates "Unfortunately, the limitations of a

13   telemedicine examination do not allow me to make any determinations regarding the validity of

14   these complaints. I suspect that there is some degree of symptoms embellishment." Dr.

15   Hendricks recommended that Plaintiff be referred to an orthopedic spine surgeon. Dr. Hendricks

16   did not recommend that Plaintiff be given a walker. (SSUF ¶ 36.)

17          On or around November 4, 2008, Dr. Akanno was informed that Plaintiff was found in

18   his cell and claims that he hit his head. Dr. Akanno was informed that Plaintiff was seen by

19   Delano Regional Medical Care Center where at CT scan was taken. (SSUF ¶ 37.) On November

20   6, 2008, Dr. Akanno evaluated Plaintiff as a follow-up from his release from the hospital.

21   Plaintiff informed Dr. Akanno that he was receiving his daily showers but wanted his showers

22   after 7:00 p.m. at his own discretion despite custody program and times. Dr. Akanno spoke with

23   custody and was informed that Plaintiff was receiving evening showers. Further, based on Dr.

24   Akanno's conversations with the institution regarding showers, Dr. Akanno informed Plaintiff

25   that if there were any issues, they needed to be addressed with custody. Dr. Akanno thus

26   informed Plaintiff that all of his chronos were updated and that he should cooperate with

27   custody. Dr. Akanno reviewed Plaintiff's CT scan which appeared to be normal and renewed

28   Plaintiff's pain medication. (SSUF ¶ 38.)

1    According to Plaintiff's Medication Administration Record, Plaintiff's oxycodone was

2  not available on the morning of November 9, 2008 or November 10, 2008. Medication can be

3  not available for several reasons outside of the control of medical staff including medication

4  shortages or delays in processing a prescription's renewal. However, according to Plaintiff's

5  Medication Administration Record, Plaintiff was given oxycodone in the evening on those days,

6  and every other day in November 2008. (SSUF ¶ 39.)

7    Plaintiff was also receiving oxycodone in the beginning of December 2008. On or around

8  December 15, 2008, Plaintiff's oxycodone had been temporary discontinued by the institution.

9  During this time period, CDCR was undergoing formulary system-wide changes in what

10  medications could be prescribed to inmate patients, including oxycodone. However, once this

11  was brought to Dr. Akanno's attention on December 16, 2008, Dr. Akanno prescribed a refill for

12  the oxycodone for 90 days. (SSUF ¶ 40.)

13    **b.    Analysis**

14    Regarding Plaintiff's retaliation claim under the ADA, Defendant Akanno argues that

15  Plaintiff has presented no evidence that Defendant Akanno took any adverse action against him

16  because of any protected activity. Specifically, Defendant Akanno argues that Plaintiff cannot

17  show he was deprived of necessary pain medication by Defendant Akanno or on Defendant

18  Akanno's instruction, or that Defendant Akanno prevented him from having his medical

19  showers. Furthermore, to the extent Plaintiff now alleges that the removal of his walker was an

20  adverse action against him, Defendant Akanno joins the other Defendants' argument that

21  Plaintiff cannot create a materially disputed issue based on a claim that was not pleaded in the

22  Third Amended Complaint, and further argues that the removal was not adverse to Plaintiff since

23  it was not medically necessary.

24    Defendant Akanno also argues that Plaintiff cannot show that any alleged adverse action

25  was taken because of the 2007 <u>Hedgpeth</u> action, including because Plaintiff never discussed the

26  lawsuit with Defendant Akanno, Defendant Akanno was never deposed in that action, and

27  because Defendant Akanno only became aware of the action in 2016, after the alleged retaliatory

28  conduct occurred. Finally, Defendant Akanno asserts that the conduct Plaintiff complains of as

retaliatory, including lack of certain treatments or the timing or denial of his medical showers, occurred because of legitimate, non-discriminatory reasons, such as the unavailability of certain medications, and due to the scheduling concerns of custody staff, which were not caused by Defendant Akanno.

As noted above, Plaintiff filed a statement of non-opposition to Defendant Akanno's motion for summary judgment. Because Plaintiff submits no evidence or argument in opposition to the motion relating to Defendant Akanno, and because the undisputed facts support Defendant Akanno's positions, the Court recommends that summary judgment be granted in Defendant Akanno's favor on Plaintiff's retaliation claim under the ADA.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants Keldgord, Campas, Covarrubias, and Hedgpeth's motion for summary judgment, filed March 25, 2016 (ECF No. 80), should be GRANTED, and

2.      Defendant Akanno's motion for summary judgment, filed May 25, 2016 (ECF No. 90), should be GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections

//

//

//

//

//

//

//

within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 18, 2017**

UNITED STATES MAGISTRATE JUDGE

28